Ms. Pitts, good morning. You may proceed. Thank you. Good morning, Judge Rollman. May it please the court, counsel. My name's Angela Pitts. I'm here on behalf of our client, James Curtis. We're here on an interlocutory appeal involving challenging a district court order directing the Bureau of Prison to forcibly medicate our client in the attempts to restore his competency. I just want to give a quick little background still about who Mr. Curtis is simply because it's been a while since the evaluations have been done in the initial brief. Mr. Curtis is returning 75 this year. He's now been in custody at the end of this month. It'll be two years. He has been married for over 50 years, which is a pretty remarkable accomplishment. And his life was going on the path that we all hope our lives go on for the first 49 until he had a traumatic event in 2009 when he fell off a ladder and suffered a head injury. And based on his wife and daughter's own report, the change in him was immediate and stark. And what you find is the very things that they comment on about him disappearing, being angry, just a complete change in his personality. His daughter comments that I just don't have my dad anymore. It is a lot that you find when we look at stories from veterans coming back from war who have suffered brain injuries. So what we're looking at here is he's now been diagnosed with delusional disorder. And the Bureau of Prison has taken a change in position as to, even as recently in this court, in the Gann decision, where they said the opportunity to treat delusional disorders with anti-psychotic medication, the success rate was around 10%. What were the credentials of this examining doctor? For Dr. Lucking? Yeah. Dr. Lucking, he's an MD, so he's the prescription doctor, not the psychologist. And he has been with Butner for quite some time. I think he actually was, if I'm correct, the BOP expert in the Gann case. So he was, at that time, including all the way up to 2008, of the mindset that this medication didn't work for delusional disorder cases. So that is his back. Your Honor? Are we talking about the same person but prescribing it nonetheless? They did not prescribe it in Gann. The decision was that that was not an overwhelming number when you're talking 10%, and so it was not prescribed. Gann was a case that went on for quite some time, coming back and forth. I think in the end there was three appellate versions of his case. And in the end, on his own, he volunteered to take medication. And in the end, he was later restored to competency and went on with his case. And this particular case, I think, is remarkable when we look at, you know, the circuits now are a little divided in terms of is it appropriate to use antipsychotic medication to treat people with delusional disorders. The Ninth Circuit in Riz, which I addressed in both my briefs, was not persuaded, nor was the Fourth Circuit, for example, in Evans, and then later in White. White's been distinguished quite often because it involved a female, and there are differences in treatment for females and males. I understand the one difference in this case is that Mr. Curtis actually was hospitalized two, well now probably four or five years ago, and treated with antipsychotic medications that were successful. Yeah, different situation, Your Honor. He was hospitalized for nine days. We don't know at what point during that nine-day period he actually took medication, and it was voluntary. It was not a forced scenario. His delusions are persecutory and paranoid, and in that episode in 2010, it could have been happenstance, because when you actually look at the studies for when you use antipsychotic medication, you know, they'll tell you best-case scenario. You might get results within a couple of weeks. Usually, you're looking at at least 120 days, and they said even in this case, they would want a minimum of four months. And quite often, even in some of the BOP's own studies, they had clients where it took up to a year for the medication to work. So it's not, you can't say with absolute certainty that it was the medication that resulted in his change during that nine-day visit. Did, I didn't look at the district court order for this purpose, and just remind me, did they put any limit on how long they could administer the medication? They're done usually, and same in this case, in four-month increments. And then a report is due after the four months, and if there has not been any improvement, then that's when the government and the BOP will decide if they want to request an additional four months, and we do it all over again. So he's 75 years old. Let's assume that he's not medicated, and what happens then? Does he, is he going to, he probably will not be returned to competency? Well we don't know that, your honor. Will he just, will he probably stay in a federal medical facility for the rest of his life? Is that the likely outcome? No, that certainly would not be the outcome if he's not restored to competency, because you would have to show that he's either a danger to himself or to others. Well, they could probably do that in this case. Well there's certainly no report that, at this point in time, that that's the case, where they would have asked for a Harper hearing. And in fact, all the reports show that he is not dangerous, and he has not, we've received zero reports from the BOP, BOP's statement that they've had any problems or issues. Certainly the incident that led to him being found incompetent is troubling, but there is nothing that indicates in his history of the 75-year-old gentleman that he has been violent. And what I really want to point out, and when we look at these cases, when you look at the Gomez is a Second Circuit case where that court did find, relying on BOP studies, that it was an appropriate thing to do. But even district courts within the Second Circuit has rejected Gomez. And they said that the analysis was so weak in Gomez that they couldn't even tell, and Lynn Bower is one of those cases, Lynn Dower, excuse me. They said that the analysis was so weak that it was unclear if the court was only finding for, in Mr. Gomez's case, or was it was like a cross-the-board decision that this was the appropriate protocol for delusional disorder cases. And in Lynn Dower, they didn't apply it, and the government did not take it up on appeal. Now, as to the first self-factor, the seriousness of the government interest, as I understand, he's charged with felon in possession of a firearm, but not a felon, but a person. Your Honor, we did not challenge that on appeal. But that's his charge. You're not challenging the first factor? We are not, Your Honor. Okay, because that's what I have the biggest problem with. No, we did not challenge it. We challenged factor two and we challenged chapter four. He was charged felon in possession, but because he had the prior hospitalization. And so there's actually some issues about that charge, but we can't even litigate that until his competency is restored. So this is not a case where he had a prior felony. It's not that 922G. Yeah, I misspoke. I know it was being, I can't remember the exact language, but it's a person with a mental defect or something. One of the things I really wanted to point out to the court, and I don't think I hit it hard enough in my briefs, was, and I was looking at the report and recommendation. Something's pretty hard in your mind. I did, Your Honor, but. I don't know if that was written by a lawyer or a high school journalism student. Well, I had a creative Harvard Law student help me out at first. Well, I think some of this hyperbolic language were probably not too pleasing to the government, and who knows, maybe not to us. But that's another point. Your Honor, when you look at the report and recommendation, the amended report and recommendation, which is the one that deals with the forced medication issue, not the first report, which just deals with incompetency, and then you look at the district court's order that adopts it. There's not a separate discussion on the fourth factor. And when you look at the report, what you will see is there's a breakdown of the first factor, which is thoroughly discussed. There is a breakdown called medical appropriateness, I believe it was the category. And then the last one is the third factor. There's not a fourth factor discussed. Now they use the topic for the fourth factor to address the second factor. And so it sounds like it's all encompassed in one, but it's clear when you look at the second factor that the court is addressing, that they're only dealing with substantial likelihood that this is the appropriate medication for this illness, and that there's an unlikeliness that it will harm him. But, here's the critical part, and the ninth circuit pointed this out in Ruiz. In the fourth factor, it's the only one where they talk about Mr. Curtis being a patient and what is in his medical best interest. And in so, you have to establish all four prongs. And here, the fourth prong was never found and not established. And that's what distinguishes this case from Mackey? Yes, your honor. Mackey wasn't a delusional disorder case. That's the other thing. Mackey was not a delusional disorder case. That's the other thing. He was found to have a psychotic disorder not otherwise specified. I see, I see. One of the evaluations, there were like three. One of the doctors said delusional disorder. That was not the doctor that testified at the hearing. And he said psychotic disorder not otherwise specified. And I would also dispute Mackey simply again because we're dealing with delusional disorder specifically here. And the literature relied upon by Dr. Lucking does not state. That was a question I wrote down. Are there any studies that would support a finding by clear and convincing evidence that there would be any, that there's any drug available that would treat your client, Mr. Curtis' condition? There is not, your honor. The only ones remotely close would be the studies done by the BOP. And those are after the fact studies where they're like, these are individuals that we treated. They've been at least three now. The most recent one was discussed in the Dillon case. More than passing strange in this day in which we're flooded with different drugs on television and everywhere else that there's not something that would help this person? But medical literature does not support that. I mean, we can sit here and be, that is odd with all the drugs that we have, that there isn't anything there. It goes back to one of your statements at the outset. There's a split among the circuits, like the fourth circuit, the ninth circuit. Take a very rigid view or strict view of the requirements of the literature that will support a finding like this. In other words, why should there be a circuit split on a medical issue? I think one is delusional disorder is considered still to be an incredibly rare diagnosed illness. And so the sample pool is so small. So what's, there's difference between a disillusion, what's it's, what has he been diagnosed as? Delusional disorder, your honor. Which is different from paranoid. It's absolutely different from and distinguished and continues to be in DSM 5, continues to be in literature. And I would, the BOP doctors try to say it's not as because there's that similar component of the delusions, but that's just one component. It does not make them the same. Is there any evidence in the record as to, even taking the best case scenario for the government's position that this drug may be effective. As to its effectiveness in a 75 year old individual. And also as to whether the likelihood of danger is higher. I mean, these are pretty powerful anti-psychotic medications. And I guess the age is something that kind of jumped out at me. Especially with, it's been reported back to him by his family. So it's anecdotally that because he's so afraid of the doctors at the BOP, he has stopped taking all medication. He's not taking his thyroid medication because he's afraid it's going to be tampered with. He's not taking his high blood pressure medication, and he won't even take Tylenol. Because, and this is what one of the doctors talked about, and I believe it was in Ruiz, is that the important thing actually with delusional disorder patients is the therapeutic relationship. And that you can't have that in the environment that you have at Butner, where you're looking to forcibly medicate the individual. That's an interesting opinion that Judge Reinhart wrote, on many points, all points. So as I was reading it, I was in connection with his case, what could be done for this person, Mr. Curtis? I think actually what you found with Mr. Curtis, Your Honor, was after that nine day incident in Kentucky, he didn't have another psychotic episode until this period now that led to him being charged in this case. So he was in the hospital one other time, but the medical expert at that point in time said he didn't have any psychotic episodes going on. He didn't have to be medicated, and he was released. So there's no reason to believe that at some point, the thing with Mr. Curtis that we've had an issue with since falling off the ladder is he goes on these trips and he disappears. But then he comes back home, and he's back to being himself. And so it can actually, by happenstance on its own, that with therapeutic treatment without any medication, and maybe even under therapeutic treatment that he would volunteer to take medication, but in this particular environment, he most certainly is. What obligations does the government have with relationship to Mr. Curtis? Do they just say, okay, go home, go out in the street? Your Honor, I believe that's why we have, the Supreme Court established four prongs, because they said forced medication should be rare. And so it can't, the answer can't be that every time we have somebody charged with an offense who has a mental health incident, we just have to hit him with drugs. And for the same reason that Judge Malloy pointed out with his own personal health issues, which wasn't addressed and considered by the magistrate judge or the district court judge, because they didn't deal with the fourth factor. Is there any, let's see, was there any testimony about the adverse side effects of this particular drug that they would- The same generic answer that the BOP gives in all these cases, Your Honor. Which is what? It's manageable? Yes, Your Honor. Cardive dyskinesia or whatever? It recognizes those, but they say that they will treat it with medication if there's an onset. And I've witnessed, I've had, I've done death penalty cases, and I've witnessed that personally. It's a horrible, horrible side effect. Again, it seems. It's not- Is this case unique because the condition that Mr. Curtis suffers from is so rarely experienced that no effective treatment, drug therapy, has been developed for it? Well, Your Honor, there was, in Dillons, which is the most recent case that came out of the District Court, District of Columbia Circuit, it actually came out last month, and they relied. Again, it would be one of those cases where we said it's contradictory to Ruiz and Evans, because they agreed with the BOP and ordered forced medication. But they relied on two BOP reports, and that was it. And one of them is the newest report, and Herbell is also involved in that one. It's the exact same doctors at the BOP that are writing these studies. But I wanted to note that they had their own chart. If you pull up the report itself, and in the chart, they show that in delusional disorders, it's less than half of those cases, this is how split it is. Less than half of those cases has it been ordered that the person was forcibly medicated. There are actually more cases where the court said no. Well, we'll give you some time for rebuttal in light of our questions. Thank you, Your Honor. We'll hear from the government. Mr. Hines. Good morning, Your Honors, and may it please the court, Glenn Hines for the United States. When you get started and are ready to discuss this, it seems to me that there's some more information that maybe the court could really further develop this case that isn't here yet. And why would we not send this back for that very analysis that really isn't present here? Well, Your Honor, you certainly could do that. But I would take issue with some of the things that the appellant's counsel mentioned. Again, the appellant's briefs in the majority of her argument do not talk about- Would you raise the lectern a little bit so that you're up to the microphone? Or that the microphone is up to you, I should say. I guess I'm too tall for you, Your Honor. I guess it's as high as it's going to go. There were, I'll go ahead and start my argument off with responding to some of the questions that were raised by the court. There was a question, I believe, from Judge Wolman with respect to what evidence was developed below, with respect to whether delusional disorder can be treated by risperidone, the drug that has worked with Mr. Curtis in the past. That was developed in the hearing, and it's at page 14 of the transcript before Judge Marcheski. Dr. Lucking mentioned, and if it pleases the court, I'll quote on page 14 of the transcript, even the individual with delusional disorder, which at one point in time was thought not to respond well to medication. As you review the most recent literature, there's an indication of substantial response for people with delusional disorder. And then he follows up to mention, again, a very important piece of evidence that is present with Mr. Curtis that may not be present with your typical individual, and it's the fact that this medication that Dr. Lucking wants to administer to Mr. Curtis has been given to him in the past, four years ago. And I understand that Judge Malloy, he's a 75-year-old gentleman. But four years ago, he was given the same exact medication in Kentucky, I believe. And his medical record shows that he responded well to it. So whether it was- But wasn't that only over a nine-day period? I believe you're correct, Your Honor. And isn't the literature, doesn't it say that it can take up to a year for this medication to take effect? Was there a cause-effect relationship or a coincidental relationship? I believe, Your Honor, what was developed below at the hearing before the magistrate judge factually and what the district court relied upon was the testimony of the medical expert and the individual who's on the ground there at Butner, that based on his experience and his review of this particular defendant's medical history, his opinion is that this medication has a substantial likelihood of rendering Mr. Curtis competent to stand trial. And again, I think it's important just for a brief moment to- But to what extent should we evaluate the medical literature as Judge Reinhart did, in effect almost ridiculing some of the studies, or at least being highly critical of them? Apparently, there is one study, a Norwegian study, that Mr. Curtis' brief relates to or talks about. Yes, Your Honor, and I- At this time, I guess, we can evaluate the validity of these studies or the lack of validity of them. And of course, Fitz's argument is that this is what the BOP always says. They're enamored of this drug, if I may be permitted to put it that way, and they think that it works. Whereas some of the literature says it doesn't work. I guess the best that I could say to respond to that, Your Honor, is there is occasionally differences of opinion within the medical community, as with any other community of experts, I guess I will say- I'll interrupt, well, that's true, I shouldn't interrupt you, but I will this one more time. Back to this Mackey case, I was struck by how persuasive both Chief Judge Vikan and the members of our panel in the case found the evidence, the testimony of the doctors in that case. They seem to be highly, well, anyway, is that lacking in this case? No, Your Honor, and again, I would just reiterate what the appropriate standard of review is in this case. Again, for the first factor, whether there's a substantial governmental interest at play, that's something the court does a de novo review over. But with respect to those other three factors, the government has to show each of those factors by clear and convincing evidence. But, as this court said, I believe in either Mackey or Fazio, the court reviews those findings for clear error. So there is some deference to be given to the magistrate judge and the lower court when you conduct your review of whether the government met those three factors by clear and convincing evidence. I don't know if this is more of a comment or a question, but it just seems to me that looking at cell, the Supreme Court started with the premise that these involuntary medications is something that's an extraordinary remedy and should be not lightly administered. And it just seems to me that when you're saying, well, maybe it might do some good and there's some study, I said ten years ago it wouldn't, but now there's a study I read someplace that says it might do some good, and couple that with the fact the guy's 75 years old. I mean, is that, to me, it seems to me, we've thrown cell completely out the window. And we're just doing it, I mean, if you can do it in this case, you can do it in any case. You're always going to find a study someplace that's going to support about anything you want to say. And as Judge Wolman says, the BOP's enamored with drugs and your office wants them. That may be an overstatement. But well, okay, I won't attribute it to you, I'll say it then. They're enamored with drugs and it just seems like this guy's 75 years old. This does seem to be the cell case. Well, Your Honor, I would- Reference to age 75 strikes awfully close to home to me, but we'll let that one go. Well, Your Honor, again, it's a point that's obviously well taken, but I would respectfully take issue with the facts of this case showing that Dr. Lucking or anyone at the Bureau of Prisons or the government or anyone representing the government is wanting to throw cell out the window. And if I could, I'll just respond to that concern by addressing briefly the facts as developed in this case that apply to the third and fourth prongs. Now that third prong, even though the appellant hasn't chose to address it, you've raised it in a way, and it's not as though the facts show that the doctors just want to forcibly medicate Mr. Curtis. Dr. Lucking stated at the hearing that Mr. Curtis, they've tried the lesser measures to try to get Mr. Curtis competent. He's been invited to participate in the competency restoration sessions. He refused. He told the doctors, I don't need to do that. There's nothing wrong with me. They've asked him to voluntarily take his medication. He's refused to do that. So the doctors have, and this is supported by his testimony and the reports that were considered below. They have considered those less intrusive measures with him. They have tried to get him to meet them halfway, and he has refused on every occasion to do that. So it's not as though they have, in violation of that third prong, jumped straight to a conclusion that they want to just engage in some sort of experimental treatment with Mr. Curtis. That's not supported by this record. And to respond to, I believe, a question, I think, Judge Malloy, that you raised with respect to the fourth prong. And before my time runs out, I feel compelled to respond to the appellant's argument that there's nothing in the record on the fourth prong. That's just simply not the case either. Dr. Lucking, and this is on pages 15 and 16 of the transcript, was asked specifically about the fourth prong. The question of whether this treatment is medically appropriate. He considered specifically whether risperidone with Mr. Curtis would cause any of those negative side effects. He put time into that, he looked at it, and he determined there would not be any negative side effects for Mr. Curtis in taking risperidone. He also ran a drug interdiction profile to see if risperidone would negatively interact with any of the other prescribed medications. I believe Mr. Curtis is on some blood pressure medication and a thyroid stimulating hormone. He looked at that, Dr. Lucking, and found that there would be no negative interactions. So he determined that based on that analysis and Mr. Curtis' past medical history of responding appropriately to this medication that he seeks to administer, that that fourth factor was satisfied and that it's medically appropriate in Mr. Curtis' case. And so, I would just respectfully- Did the district court, excuse me, expressly address that aspect of the cell factors? Yes, your honor, he did. And although the appellant says that the district court just rubber stamped what the magistrate judge did, that's not correct. I've pointed that out in some detail in the government's brief, but there's evidence in the record. And if you look at the district court's order, the district court did conduct the review that he was required to conduct in reviewing the magistrate's findings. And if you look at, again, page eight to nine of the government's brief, and I'm not going to insult the court's intelligence by reading that. But what the district court found was he believed that the thrust, the primary thrust of the appellant's argument was just that they have a difference of opinion with Dr. Lucking based on the fact that Dr. Lucking used to have a different opinion with respect to whether psychotropic medication is effective in treating this type of appellant with this type of condition. And the district court basically said that he found Dr. Lucking's testimony to be credible, and that the appellant didn't seriously appear to challenge his credentials. And he stated the fact that a doctor or the medical community might have an opinion that evolves over time. And again, the magistrate judge indicated there was a DSM 1, 2, 3, 4, and so forth. And some things appear in the DSM, and then some things are removed and moved around. But it shows that just because the opinion of the medical community or a doctor might change over time, doesn't necessarily mean that that opinion is incorrect. And so the district court did appropriately pay heed to all four self factors. And this court has pointed out in Fazio, and I believe, your honors, it's near the end of the Fazio opinion. But I would respectfully invite the court's opinion to that analysis. But the Fazio court, at the end of that opinion, addresses factor two and four. And although those facts in Fazio may not be directly on point with this case, the way the court resolved Fazio, I think, is particularly helpful. But the court basically said the same thing that the district court said here, that Fazio's arguments in those cases, basically, when distilled down to their essence, was an argument that we just don't agree, we don't agree with what the doctor said. And that's not an appropriate showing that the court below failed to properly consider the four self factors, or that the court below committed clear error. Does the forced medication order specify specific medications, or is it just left to the best judgment of the doctors? Your honor, the request, I guess what I'm getting to is, let's say they start him on the medication, but he, because of his delusional disorder, doesn't trust the doctors, doesn't take his blood pressure medicine. And all of a sudden, now his blood pressure goes sky high. Does it allow him also then to forcibly administer blood pressure medication? No, your honor, it's very specific, and Dr. Lucking's request was very specific to Risperidone, and it's for a four month period. And I agree with my co-counsel that it's for no more than a four month period. But it's specific to Risperidone for a four month period. And again, Dr. Lucking opines that there's a substantial likelihood that it will, based on that particular drug being successful with other patients and with this one, he believes it's substantially likely to render Mr. Curtis competent to stand trial. Your honor, subject to any additional questions, I believe that concludes my remarks. Maybe we shouldn't even consider this, but suppose if we just reverse and say the government didn't make its case, what happens to Mr. Curtis? Well, your honor, I believe if the court were to reach that conclusion, and I don't believe that it's supported in the record, but- Well, we shouldn't go outside the record. It's something that maybe at the back of my mind- I believe the process, your honor, and again, I would agree with- Maybe we shouldn't go there. I'm just curious about it. Well, if it's unsuccessful, your honor, there would be a dangerousness hearing. And at that point, we would have to determine whether Mr. Curtis would defend himself or others, and then take appropriate steps for whether he should be hospitalized at that point or released back into the public. I see. So it just would not willy nilly be, well. There would be a civil commitment. Yes, your honor. Be a civil commitment. Okay, thank you. Thank you, your honors. Ms. Bitz, we'll give you a few minutes on rebuttal. Thank you, your honor. I appreciate that. I just wanted to note quickly, Fazio is a paranoid schizophrenia case. It's not a delusional disorder. And what the court was disagreeing with was Fazio's doctor was asserting he was a delusional disorder. And BOP were saying paranoid schizophrenia. So that case isn't on point in terms of the appropriate medical care in that analysis. I did look up from the most recent BOP case, or research and study, which is called the cell effect. And that was for 2003 to 2009 of the delusional disorder cases. There were 44 times where they wanted or requested the opportunity to forcibly medicate. They were denied 29 times, 15 times they've got the approval from the district court to do so. And they were successful over that six year period, 11 out of the 15. In terms of the literature, there's only three now that I'm aware of that shows that there's a 70% or greater success rate in using anti-psychotic medication. All of those are studies done after the fact by BOP doctors. And at least one doctor is consistently involved in all three studies, and that's Dr. Herbell. Of course, we know what the Ninth Circuit said about that study. We do, your honor. But still in all, is that, maybe it was just the particular facts of the Ninth Circuit case. In other words, what are we appellate judges supposed to do? Read all of these studies and then make our independent evaluation of their validity? Well, the problem is when you look at the testimony of Dr. Lucking, and that was actually criticized by the Southern District of New York judge and Lynn Dower. Is that they speak very superficially and generically about the success rates. They'll give you a success rate, but they don't give you the details of the study. So unfortunately, a district court judge, unless he actually looks at the studies, and if he just goes with the doctor's testimony. And I think the other thing that is troubling is, in the cases where it gets affirmed, usually it's where there wasn't an expert to counter what the BOP doctors were. To alert the district court judges that that's not what those studies say and that there's more behind those studies. A lot of the studies cited to were schizophrenia cases relied on by Dr. Lucking. Remarkably, these studies weren't new studies. He was citing the studies from the 90s and from 2000. So to be like, there's new literature. There isn't new literature that has changed. The only new literature is the BOP literature. And so those are self-serving. Well, is that so inherently suspect? It may be in your mind, and I know what you've said about, we won't go into some of her hyperbolic statements in the brief. Well, I would say one reason why I would say it's suspect, or actually two. Once we started establishing in courts what that rate were, whether it was paranoid schizophrenia or other cases where suddenly 70% became the magic number. Suddenly BOP had 70% or greater success rate in the reports. The other thing that I think is concerning and alarming is there's a greater push in these delusional disorder cases to forcibly medicate them as opposed to therapeutic treatment. It's simply because of the current climate that our nation's in. All you had to do is pick up the paper today for three days in a row and you read about a shooting. And so I can understand the angst of the government, of law enforcement, and even this court. But I think Sel, and the Supreme Court makes it really clear, Your Honor, we can't just be popping peels down people's throat and holding. And this is violent, what they do to these individuals. And we can't just be doing that because what else do we do? Well, what else do we do? Well, how do we establish, we, the government, the society, establish this therapeutic relationship for the Mr. Curtis's of the world? Instead of building more prisons, maybe we go on the preventive end. And what counsel said is, Mr. Curtis isn't done. He will have a civil commitment proceeding if this court sends it back. This is not the end of the question. It's not the end of the support system for Mr. Curtis. It doesn't just end. Well, we thank both sides for the argument. Thank you, Your Honor. An interesting case, a challenging case. It is submitted. We will take it under consideration. Thank you, Your Honor. Does that.